In this case, the plaintiff, a resident of the City of New York, seeks to recover the sum of $700 from the defendant, Ed. Bulliard, doing business as Evangeline Pepper Food Products, and engaged, amongst other manufacturing enterprises, in the manufacture of vinegar at St. Martinville. The basis of the suit is to enforce a contract allegedly made by correspondence. The plaintiff, who it appears had some thirty years' experience in the manufacture of vinegar in Europe, alleges that defendant employed him to advise defendant and furnish defendant with certain expert knowledge and counsel in connection with generation of vinegar in order that the yield and quality of production might be increased at defendant's plant. He alleges that he was to examine generator sheets relative to the operation of four generators operated by the defendant; and in pursuance of the contract, certain generator sheets were sent to him which were examined by him in detail and as a result of which he advised defendant fully in connection with the proper operation of said generators. He further alleges that he furnished to the defendant the expert information and instructions as to the method of operating the said generators in accordance with the agreement which had been made between them, and further advised the defendant that he was ready and willing to answer any further inquiries which might be presented; that he was to receive a fee of $175 per generator, and there being four generators, he is entitled to the sum of $700.
In answer to a prayer for oyer, the plaintiff filed ten letters from himself and defendant and four generator sheets.
The defendant, in his answer, admits the furnishing to plaintiff of four generator sheets, but denies all of the other allegations of plaintiff's petition, and sets forth that such information as plaintiff gave him was of no use or value since he had already had access to that information. In further answer, he avers that at the time of receiving the first letter of plaintiff, which was September 11, 1939, he was using a preparation for the manufacture of vinegar known as "acetopep" imported from Germany and, at that time, war had been declared between Germany and England and the English blockade was effective. Fearing the effect of the blockade, he was desirous of obtaining information as to where he could purchase a supply of "acetopep", or other nutritive substance used in the manufacture of vinegar and/or which might result in increasing the production or yield of his plant, or which would cost less than "acetopep". He particularly denies that he ever intended to contract with plaintiff for his services; and avers that no contract was entered into in that there was never a meeting of the mind, and no definite fee was entered into; that the four sheets sent to plaintiff were the sheets of one generator and not of four generators.
In the alternative, he avers that in the event there was such a contract of employment, then such contract was entered into through error and mistake on his part.
The trial of the suit resulted in a judgment dismissing plaintiff's suit. Plaintiff has appealed.
The facts of this case are that plaintiff, a native Czechoslovak, but now a naturalized *Page 857 
citizen of the United States, had had thirty years of experience in the making or manufacturing of vinegar in Europe, prior to his coming to the United States about in the middle of 1939, and was highly recommended by vinegar manufacturing companies of Europe, particularly the Frings Company, a manufacturer of a vinegar generator. He had also collaborated with the Frings Company in erecting and in operating 120 of their generators for a period of eight years prior to his coming to this country.
The defendant is engaged in the manufacture of sugar, syrup, vinegar, canning pepper condiments and food at St. Martinville, Louisiana. Prior to his engagement in the manufacture or production of such goods, he was a druggist and a chemist. He operates his plants with the help of his three sons, one of whom is in charge of the vinegar plant. They have had thirty years of experience in the making of vinegar. Prior to 1932 defendant was using domestic generators in the making of vinegar; and in 1932 defendant acquired two Frings generators, generators made and patented in Germany.
Vinegar is made with bacteria which has to be fed. It was recommended by the Frings Company that defendant use as a feed a preparation patented by the Frings Company, known as "acetopep". This feed was obtainable from Germany or from the authorized agent of the Frings Company in this country.
War was declared between England and Germany on September 7, 1939, The exchange of letters between the plaintiff and defendant began on September 11, 1939, or four days after the declaration of war between England and Germany, and the English blockade was in effect.
Plaintiff, on September 11, 1939, wrote defendant informing him that he had had collaboration with the Frings firm in Europe for eight years and that in the last five years, the Frings generator system had been improved and they were now able to produce vinegar in quantities formerly considered as impossible. After setting forth his experience with Frings generators in Vienna, he informs the defendant that he can possibly advise him how to increase his production and eventually to improve the yield, and suggests that the records of the generators for the last month be sent him, and that he will then inform defendant how to improve the performance of these generators, leaving the matter of fees for his services up to defendant. On September 20, 1939, the defendant replied as follows: "We have your letter of Sept. 11th, in reference to increasing our production. Please advise the cost per generator." [11] On September 24, 1939, the plaintiff, in answer to defendant's letter of September 20, 1939, stated that under an agreement with a Frings plant in the U.S.A., his services were retained for 6 months, on the basis of a fee of $125 per generator for the 6 months, plus an additional $50 per generator in the event production increased at least 20%, and that payment was made at the end of each month.
He states further, in effect, that in order to attain the proper results, he requires 6 months of activity, and that he would gladly work for defendant under the conditions set forth, and would give him information about all problems of the vinegar production. He then suggests to defendant that he be furnished with the records of each generator, according to enclosed sample, and that he would then be in a position to send defendant instructions, by correspondence, which would be simple and plain and easy to carry out.
He then reviews his accomplishments in the Frings plant under his direction at that time, stating that within a few weeks he has already very good results and considerable improvement, with the resulting increase in production and yield. He discusses the Frings technique, and informs defendant that practically the same technique can be applied to his type of equipment, and that production thereby can be increased and the yield improved if below 90% or 92%, and he repeats that in order to understand the generators he must have the generator sheets for the past month, and states that upon receipt thereof he will inform defendant of measures to take to increase production.
In reply to that letter, defendant, on September 26, 1939, wrote the plaintiff as follows:
"As per your request we enclose sheets of our generators. We are awaiting an immediate reply."
The generator sheets enclosed were four in number, being the generator sheets of one generator for the last two weeks of August, and the first two weeks of September. *Page 858 
Under date of September 30, plaintiff acknowledged receipt of defendant's letter of September 26, and the sheets therein enclosed, and stated that it was his impression that his proposal made in his letter of September 24 was approved and in effect that he appreciated the order. He states further that it is his understanding that the sheets are for more than one generator, since the letter of transmittal refers to generators, and also due to some other sign (probably the sheets themselves) indicating this circumstance. He then points out that according to the generator sheets the generators are working improperly and that by the alcoholic content of the low wine and the acidity contents of the finished vinegar it is shown that the average yield is about 82% and that by wrong operations there is a loss of 10%, since the yield of the Frings generator must be 90% to 94%; that consequently there is a loss on each generator of about 10,000 gallons per year, meaning a financial loss of $1,000 per year on each generator. He states that this supposition is based on the premise that defendant does not place vinegar in the mixture, and that should that supposition be wrong, the loss would be higher. He then explains in detail the procedure used in the other Frings factory under his direction in the preparation of the mixture which results in a finished vinegar with a grainage on the average of 117, and also increases the fluid from 2400 gallons of low wine to 2470 to 2490 finished vinegar. He points out to defendant that by proper technique a higher grainage can be attained, which would mean a saving of freight and storing, but that with a lower grainage, the generator works quicker.
He states that defendant's loss is caused by evaporation, which can be prevented by changing the temperature on certain thermometers, as outlined by him. Secondly, he points out, that defendant is following the wrong procedure in keeping the hourly outflow infusion too low and explains in detail how the infusion rate should be regulated. Thirdly, he advises an increase in the Frings feed, or "acetopep", and states that Mr. Ruttkay is in a position to deliver "acetopep" on a permanent basis. He ends his letter by stating that he desires defendant to carry out the three measures pointed out and then send him generator sheets explaining in detail how to prepare the sheets, and that he will thereupon immediately furnish defendant with his comment.
Not receiving any reply to his letter of September 30, plaintiff wrote to defendant again on October 19 referring to his letter of September 30th and expressing regret that he had not received the generator sheets for each batch or charge, and again criticising the sheets already received by him.
On October 31, 1939, plaintiff wrote the defendant in which he refers defendant to his letters of September 30 and October 19, and regrets that "up to date" he has not received any further sheets about the working of the generators.
On November 9, 1939, plaintiff wrote the defendant about the operation of generators in Europe during the winter season, giving advice to defendant to have all windows open in the generator room, and called defendant's attention to the fact that he had not had any reply to his letters of September 30, October 19 and October 31, and again requesting that he be furnished further generator sheets. Plaintiff closes this letter by requesting a check for his fee for the month of October.
On November 27, 1939, by registered mail, plaintiff wrote defendant as follows: "I really cannot understand why I have so far received no response to my letters. In accordance with our correspondence, we came to a clear and correct agreement about my activity for you and thereupon you have sent me on the 26th of September the sheets of your generators and asked me for my advices." After stating that he had given defendant advice in his letters of September 30, October 19, and November 9, and repeatedly requested further sheets, plaintiff then states that he begs of defendant to let him know why he failed to send to him further sheets and why his letters were not answered.
On November 30, 1939, defendant wrote plaintiff as follows: "Replying to your favor of November 27th, sorry we cannot do as we please. We have made application to get your help and have not received a reply to this writing. What we need is a formula to make a feed for generator. Please quote."
On December 5, plaintiff, in answer to defendant's letter of November 30, wrote defendant that his letter was quite a surprise to him. He referred defendant to defendant's letters of September 20 and 26, and his reply of September 30, together with his letters of October 19 and November *Page 859 
9. He informs defendant that they made a legal agreement for his services and that he insists that defendant fulfills his part thereof. He asks an explanation of the letter.
On December 23, 1939, plaintiff wrote defendant stating that he regretted that he had not had a reply to his letter of the 5th, and again begged defendant to send to him further sheets in order that he, plaintiff, could give defendant further advice. He informs defendant that he is in no position to relinquish any of his rights under the agreement made with defendant since, when he left Germany, not being a German, his account was frozen and consequently he depended upon his earnings as a vinegar expert. He again calls upon defendant for an explanation of his letter of November 30. This was a registered letter.
On December 25, 1939, the plaintiff wrote to defendant relative to his inquiry about a formula as contained in defendant's letter of November 30, 1939, informing defendant that an individual in Budapest, Hungary, had a very good formula for a vinegar feed which defendant could obtain for a fee of $250 cash and that upon remittance of that amount to plaintiff, plaintiff would deliver to defendant the formula with instructions. In this letter plaintiff again called defendant's attention to his letter of December 23rd. On December 29th defendant replied to this letter inquiring as to whether the raw material for this feed could be bought in this country.
On January 2, 1940, plaintiff answered that the raw material could be bought in this country, and he again called the defendant's attention to his letter of December 23rd.
Not having received a reply to his last letter, on January 16, 1940, plaintiff again wrote defendant reminding him that 3 1/2 months had expired since the entering into the agreement of employment, reminding defendant that he had requested the fulfillment of the agreement without avail. He demands that defendant sends him further sheets and a check to cover what is due him, advising plaintiff he expects a reply by January 24, 1940. Not having had a reply, this stilt followed.
Plaintiff testified that the information which he gave to defendant was of a confidential nature and unknown in this country and could not be obtained from any ordinary vinegar manual. He had no knowledge that Frings had ever issued a manual in this country because he did not know who had collaborated with Frings, but that in Europe Frings did not issue manuals with the sale of his generators. In his testimony he insists that he had an agreement with defendant to give defendant expert advice in the manufacture of vinegar at the price of $125 per generator, plus $50 per generator if increase in production exceeded 20%. The remainder of his testimony is in line with his letters, in that in his letter of September 30th he informs defendant that the average output of the generators is 82% when it should be 92 to 93% and that defendant is losing $1,000 per generator yearly.
He offered the testimony of a Mr. Endress of Evansville, Indiana, official of the Crystal Pearl Products Co., to the effect that he had employed plaintiff as consultant in the manufacture of vinegar with satisfactory result.
Defendant testified that he operates two Heinrick Frings vinegar generators, having purchased the same in 1932 from the United States agent of Frings. Prior to his acquisition he fully informed himself as to their mechanism, installation and operation, and spent two weeks in a Frings plant at Newark, N.J. When he purchased the generators he was furnished a manual relative to their operation and manufacture of vinegar. His sons also visited the Newark plant for instructions relative to the operation of the Frings generators, remaining some two weeks. Besides receiving the manual, he was given specific instructions by letters. From the very beginning, he used "acetopep", a product of Frings, as a feed in the manufacture of vinegar, obtaining it from the United States agents of Frings, Szamek and Paul Ruttkay. Defendant states that his motive for writing to plaintiff was that due to the war he feared that he could not get any more of that feed direct from Germany. He admits sending the four sheets in pursuance to the letters of September 11 and 24th, but disclaims any intention of making a contract, His son, Leo, handles all the technical part of the generators. He admits having received all letters written by plaintiff and admits not having answered the letters of September 30 and subsequent. The generator sheets were prepared by Leo Bulliard. He states that he did not answer the letter of September 30 because he did not want to commit himself. "He was making a *Page 860 
contract without my consent." He denies using any of plaintiff's advice. He admits of not advising plaintiff that he did not consider that plaintiff had a contract with him, nor did he inform him that he, defendant, had had the same information from the manual published by Frings Company.
Leo Bulliard, son of defendant, testified that he has been connected with his father's business as production manager and general manager and in charge of the vinegar plant. This witness describes the process of manufacturing vinegar and the Frings generators. In regard to the letter of September 30, witness states that plaintiff did nor impart any new information to him, having had and using the said information prior to the letter, having obtained the same from the U.S. agent of the Frings Company at the time of the purchase of the generators, and also from the manual and blue print furnished him by the Frings Company; also that his father, his brother Tom and himself had had each a two weeks' course in the operation of the generators at a plant in Newark, New Jersey, under the U.S. agent of the Frings Company. As to the operation of the generators, plaintiff did not give any amount or any kind of information or impart anything of value or benefit to him or his father in his letter of September 30, because they had already had this information through Mr. Szamek, the U.S. agent of the Frings Company, and directly from the manufacturer of the generators. The correspondence had between plaintiff and defendant was referred to him and attended to by him. He was much worried about a food for the bacteria in the manufacture of vinegar because England and Germany were at war, which brought about the correspondence. He had been using "acetopep" ever since acquiring the Frings generators and from the same source as plaintiff recommended or advised. As to why the letter of September 30 was not answered, he states: "When my father received this letter from Lowy, I brought him the manual and showed him it was copied off the manual". He denies that he had any intention of contracting any liability by sending the four sheets. He states that he has sent like sheets to other companies interested in the manufacture of vinegar, for comparison and criticism without liability, and such criticism was not different from the readings recommended by plaintiff. He contends in his testimony wherein such information as given by plaintiff had been previously obtained from other sources, identifying letters and the manual which were filed in connection with his testimony. The sheets sent to plaintiff covered operation of one generator for four weeks. He denies ever using any of the information imparted by plaintiff.
The plaintiff contends that he had a contract of employment while defendant contends that there was no contract of employment, and further that plaintiff imparted no new information to him, therefore there was not only not a meeting of minds, but also a lack of consideration in the entering of a contract.
Plaintiff relies altogether on the letters as outlined above, particularly the letter of September 30, and argues strenuously that there was a contract of employment from these letters, using as a corroborating circumstance the fact that defendant failed to advise him otherwise and in failing to answer repeated letters after September 30, 1939, and the sending of the four generator sheets pursuant to plaintiff's letter of September 24.
After a careful reading and consideration of this record, we are of the opinion that plaintiff and defendant entered into a contract of employment wherein plaintiff was to furnish defendant expert advice in the operation of defendant's Frings generators at a fee of $125.00 per generator.
It is not always necessary that a contract should be committed to writing or signed by the parties. Civil Code, Article 1811, provides that "The proposition as well as the assent to a contract may be express or implied: Express when evinced by words, either written or spoken; Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean, or by legal presumptions are directed to be considered as evidence of an assent." Civil Code, Article 1816, provides that "Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract." Civil Code, Article 1817, provides that "Silence and inaction are also, under some circumstances, the means of showing an assent that creates an obligation." However, acts, silence and inaction, from which consent to an agreement is implied must afford conclusive evidence of such consent. Civil Code Article 1818 *Page 861 
provides that "Where the law does not create a legal presumption of consent from certain facts, then, as in the case of other simple presumptions, it must be left to the discretion of the judge, whether assent is to be implied from them or not".
As we view plaintiff's letter of September 11, 1939, defendant's letter of September 20, 1939, plaintiff's letter of September 24, and defendant's letter of September 26, we are of the opinion that defendant's assent to the contract was expressed, and if not, then it was certainly implied. Plaintiff was justified in believing that his proposition as outlined in his letters of September 11 and 24 had been accepted by the defendant. In fact, he so informed defendant by his letter of September 30, and proceeded to give advice to defendant in the operation of the generators. After receiving plaintiff's letter of September 30, defendant remained silent, although repeated demand was made upon him to fulfill his part of the contract and explain his inaction, presumably accepting the advice given in the letter of September 30, and that contained in the letters of October and November 9. It was only after the filing of defendant's answer that plaintiff was informed of the position of defendant. There is a time in law when men should speak or when they will be bound by their silence.
Defendant contends that in the event we should hold that there was a contract of employment entered between plaintiff and himself, then and in that event, it was entered through error on his part, in that he was only desirous of obtaining information with reference to a feed for the bacteria. We cannot agree with him. There are letters which passed between plaintiff and defendant relating to "acetopep" or feed for the bacteria, but these letters do not relate to the formation of the contract. The information sought and given relative to the feed was part or incidental to the contract of employment. Whenever the defendant inquired of the plaintiff for any information, it was immediately given to him by plaintiff.
Defendant further contends that there was a lack of consideration in that he already had all information given him by plaintiff. Again, we must disagree with him. While it may be true that plaintiff may have given defendant such information relative to the three thermometers on the outside of the generator as was contained in the manual given to him by the Frings Company, yet we find other advice or information as contained in plaintiff's letter of September 30, and subsequent letters which is not contained in the manual, such as defendant, through wrongful operation of the generators, was losing annually $1,000 per generator and the basis for such conclusion. Furthermore, plaintiff pleaded with defendant to carry through with his part of the contract, and if he did not receive any benefits therefrom, it was all through his own fault and not that of plaintiff.
His explanation of why he sent the four generator sheets to the plaintiff, that is, that he had the custom of interchanging sheets with other manufacturers of vinegar, is not plausible to us for the reason that he well knew that plaintiff did not hold himself out as a manufacturer of vinegar, but held himself out as an expert or consultant in the manufacture of vinegar. No one is presumed to work for nothing. It is admitted that defendant had two generators, and since the fee was $125 per generator, the plaintiff is entitled to recover the sum of $250.
For these reasons, the judgment appealed from is annulled, reversed and set aside, and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Joe Lowy, and against the defendant, Ed. Bulliard, doing business as Evangeline Pepper Food Products, in the full and just sum of Two Hundred Fifty Dollars, with legal interest from judicial demand until paid, with all costs in both courts. *Page 862