SAMUEL, Judge.
This is a suit for $25,000, the amount allegedly due under an oral contract to share a commission; alternatively, the same amount,is sought under the doctrine of quantum meruit. Defendants answered in the form of a general denial. After trial there was judgment, based on quantum meruit, in favor of plaintiff in the sum of $5,000. Defendants have appealed therefrom. Plaintiff has answered the appeal seeking an increase in the award to the total amount of $25,000.
The basic facts are not in dispute. The individual defendant, William Abroms, a registered broker dealing in the sale of securities, is the owner and operator of the other defendant, Abroms & Co., Inc., an investment banking firm. Abroms and his firm were offering for sale a large block of stock in Jefferson Construction Company, Inc., which stock was owned by that company’s president and his wife and represented the controlling interest in the corporation. The stock was listed on the American Stock Exchange but the transaction was not to be handled or traded on the exchange. Abroms had called, unsuccessfully, upon various people in New Orleans in an effort to interest them in purchasing the stock. One of those persons suggested the plaintiff Glazer, a business executive and president of several corporations, as a likely prospect. During the early part of May, 1963 Abroms called on Glazer for the purpose of attempting to sell the stock to him. They had lunch together and spent some time in Glazer’s office discussing the proposition, with Abroms explaining to Glazer the details of the transaction, including the financial condition of Jefferson, the number of shares offered (approximately 389,000), the purchase price ($5 per share), and the commission ($12 per hundred shares, the same as that charged on the New York Stock Exchange) .
Glazer was not interested in making the purchase. However, he informed Abroms he knew a Paul Kapelow, president of Kesk, Inc., who probably could use the type of company involved and who might be interested. While Abroms was still in his office Glazer telephoned Kapelow and informed him about the sale offer, giving Kapelow information relative to the company, the shares offered, the cost thereof, and the commission. He suggested to Kapelow it would be “a good tool” for him. Kapelow was interested and said he would see Abroms. Abroms immediately rode to Kapelow’s office in Glazer’s automobile and discussed the matter with Kapelow. An hour or so later Abroms telephoned Glazer and told him Kapelow had said he was interested in buying the company if it was as Abroms had pictured it. At that time Glazer told Abroms, “Fine. We will split the commission”, or words to that effect. Abroms’ reply was that in Glazer’s tax bracket he shouldn’t be interested, or didn’t need the money, or words to that effect.
Several days later Abroms called Glazer for information regarding Kapelow’s financial ability to go through with the transaction. Glazer gave that information based on his personal knowledge of Kape-low. Later Glazer also obtained for Abroms, at the latter’s request, a Dun & Bradstreet report (Glazer subscribed to that service) on Jefferson Construction Company, Inc. and its president. On April 7, 1963, when Kapelow and Abroms were in Boston for the purpose of completing the transaction, they spoke to Glazer by telephone advising him the sale would go through. On that occasion Abroms suggested to Glazer that he could realize a substantial profit by purchasing some of the Jefferson stock before the sale became known.
*292 After the sale took place on April 22, 1963, Glazer phone Abroms inquiring as to whether or not the latter had received the commission and in what amount. Abroms replied he had received his commission and stated the amount. Glazer then asked, according to him, “What about me?”, to which Abroms replied “I thought you were just kidding.” Subsequently a luncheon was arranged by Glazer during which he and Abroms discussed the matter of the latter paying a part of the commission to Glazer. Following the luncheon Abroms wrote Glazer denying any such payment was due.
Kapelow testified that, just prior to the agreement to consummate the sale, while he and Abroms were in either Boston or New York, he asked Abroms how Glazer would “fit in the picture” to make sure that he, Kapelow, was not obligated in connection with any arrangement Abroms and Glazer may have had between themselves. Abroms’ answer was that he, Abroms, would take care of Glazer.
Abroms’ testimony is to the effect that he thought Glazer was joking when he referred to splitting the commission; he had never shared a commission with anyone other than a broker; the rules of the National Association of Security Dealers, of which he was a member, specifically prohibited such action; and he considered he had “taken care” of Glazer when he furnished the latter with information that the sale would go through and suggested Glazer purchase some of the Jefferson stock which he knew would increase in price.
As a result of the sale the Jefferson stock increased in price from approximately $3.75 per share to $6 per share. The amount of commission received by Abroms was $51,-118.86, $28,438.86 in cash with the balance, $22,680, represented by five promissory notes. Plaintiff is not a broker, nor has he ever engaged in the business of selling stock or securities; he had known Kapelow over a period of thirty years; and, following the purchase of the Jefferson stock by Kapelow he did sell some products of his corporations to Jefferson.
Since there was no express consent by Abroms to Glazer’s statement or offer that they “split” the commission, defendants contend there was no contract between the parties. Plaintiff concedes there was no express contract; but he contends the absence of a refusal by Abroms of Glazer’s proposal to divide the commission, together with Abroms’ silence as to whether or not he accepted that proposal while he proceeded to carry through and consummate the transaction with Kapelow, constituted an implied acceptance thereof and resulted in an implied contract under which, or alternatively under the doctrine of quantum meruit, he is entitled to recover.
Pertinent to plaintiff’s contention relative to implied acceptance are Civil Code Articles 1811, 1816, 1817 and 1818, which articles read:
“The proposition as well as the assent to a contract may be express or implied:
Express when evinced by words, either written or spoken;
Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent.” LSA-C.C. Art. 1811.
“Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under circumstances that naturally imply a consent to such contract. To receive goods from a merchant without any express promise, and to use them, implies a contract to pay the value. If an offer is made of an article in deposit, and the article is received, the contract of deposit is complete. If a mandate is acted on, the mandatary is bound in the same manner as if he had accepted in writing. In all those cases and others of the like nature, *293 all the conditions, which he, who gives or proposes, annexed to the delivery or the acceptance of the proposition, are also presumed to have been accepted by the act of receiving. If the merchant, in delivering the goods, declare that they must be paid for by a certain time; if the depositor designate how the deposit is to be kept, or the mandator in what manner his commission is to be executed, he who receives and acts is obligated to the performance of , all,,..these conditions.” LSA-CC Art.” 1816'' '
“Silence and inaction are also, under some circumstances, the means of showing an assent that creates an obligation; if, after the termination of a lease, the lessee continue in, possession, and the lessor be inactive and silent, a complete mutual obligation for continuing the lease, is created by the act of occupancy of the tenant on the one side, and the inaction and silence of the lessor on the other.” LSA-C.C. Art. 1817.
“Where the law does not create a legal presumption of consent from certain facts, then, as in the case of other simple presumptions, it must be left to the discretion of the judge, whether assent is to be implied from them or not.” LSA-C.C. Art. 1818.
The first question presented is whether, as provided by the quoted articles, Abroms’ actions were done “under circumstances that naturally imply a consent” and/or his silence and inaction occurred under such circumstances they show a consent, to a contract between Abroms and Glazer.
LSA-C.C. Art. 2288 provides that presumptions not established by law are left to the judgment and discretion of the judge, “who ought to admit none but weighty, precise and consistent presumptions, * * *.” Under that article actions, silence and inaction, from which consent to an agreement may be implied must afford convincing, and even conclusive, evidence of such consent. See Lowy v. Bulliard, La.App., 17 So.2d 855, 860. This is consistent with LSA-C.C. Arts. 1812, 1813, 1814 and 1815, relative to the certain consent necessary in an express contract. Those articles provide that such consent must be given in a language understood by the party who accepts; the words by which it is conveyed must be in themselves unequivocal; and even when the words used are unequivocal, they are not obligatory when from the context it appears otherwise, or where they were expressive of mere intent, or where from the manner in which it is made a promise shows there was no serious intent to contract.
We regard Abroms’ statement to Kape-low, made just before the sale was completed in Boston or New York in reply to the latter’s question as to how Glazer would “fit in the picture”, that he, Abroms, would take care of Glazer, as merely the assurance Kapelow was seeking to the end that he, Kapelow, would not be obligated to Glazer. The only actions, silence or inaction on the part of Abroms which can be considered as implying or showing consent are: his answer to Glazer’s statement or proposal that they split the commission (given in reply to Glazer’s proposal shortly after Abroms first had seen Kapelow), his silence as to that proposal thereafter until his denial (by letter) of the existence of a contract, his requests of Glazer for, and acceptance of, information regarding Kape-low’s ability to finance the sale and the Dun & Bradstreet report on Jefferson Construction and its president, and his actions in proceeding with the Kapelow negotiations to consummation of the sale.
Although Glazer had many business ventures, none involved the selling of stocks or securities as a broker or otherwise. There is no evidence in the record indicating, either as a matter of custom or in any other manner, that in the absence of an agreement with Abroms, Glazer had any reason to believe he would be paid for the information and help he furnished Abroms. Nor is there any evidence indicating that, prior to his telephone conversation with *294 Glazer shortly after his first meeting with Kapelow, Abroms had any reason to believe he would be required to pay for the information and help. The only evidence in the record, Abroms’ testimony to the effect that sharing a broker’s commission with anyone other than a broker was not done and actually was prohibited insofar as the broker was concerned, is to the contrary.
Abroms was not silent when Glazer made the proposal; in our opinion his answer thereto, that in Glazer’s tax bracket he shouldn’t be interested or didn’t need the money, amounts to a rejection. Thereafter Glazer did not demand or mention the “splitting” of the commission until after the sale was consummated. The requests for information regarding Kapelow’s financial standing and for the Dun & Bradstreet reports are relatively unimportant in connection with the question under discussion; that information and those reports were easily obtainable elsewhere. The fact that Abroms proceeded with the Kapelow negotiations to a completion of the sale has no evidentiary value insofar as the question of implied acceptance of the proposal is concerned; in either event, whether the proposal was accepted or rejected, it is clear that Abroms would have proceeded with the sale.
In the instant case there is no legal presumption and we are unable to find the required simple presumption of acceptance. The actions, silence and inaction upon which plaintiff relies for a recovery fall far short of affording convincing or conclusive evidence of an implied consent by Abroms to Glazer’s proposal. There was no implied contract.
Quantum meruit is founded upon LSA-C.C. Art. 1965, which provides that the courts must apply equity in cases where the law and the agreement of the parties are silent, and LSA-C.C. Arts. 2292, 2293 and 2294, relative to quasi contracts, which provide, in pertinent part, that such contracts arise without any agreement on the part of the parties thereto and “ * * * are the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third party.”
Here there was no express contract; and we have just concluded there was no implied contract. We also conclude there is no substantial evidence to support the existence of a quasi contract or of any obligation upon which recovery by plaintiff can be predicated. It follows that plaintiff cannot recover on the . basis, .of quantum meruit. For quantum meruit is inapplicable in the absence of an obligation, either implied in law or otherwise, under which recovery may be had.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered, adjudged and decreed that there be judgment in favor of the defendants, William Abroms and Abroms & Co., Inc., and against the plaintiff, Jerome S. Glazer, dismissing said plaintiff’s suit; all costs in both courts to be paid by the plaintiff, Jerome S. Glazer.
Reversed.